UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| ARTURO LOPEZ FERNANDEZ, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. G-09-254 |
| | § | |
| GLOBAL INDUSTRIES LTD, *et al*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**
**(Findings of Fact and Conclusions of Law)**

**I.      INTRODUCTION**

This case was tried to the Court over several days. After the testimony concluded and the

exhibits were properly marked and admitted, the evidence was fully submitted to the Court.  The

Court has now reviewed the documentary evidence, relevant testimony and considering the

submissions of the parties determines that the plaintiff, Arturo Lopez Fernandez, has established

by a preponderance of the evidence that he should prevail only on his claims of general

negligence and products liability.

**II.      PROCEDURAL BACKGROUND**

The Court is of the opinion and holds that this case falls within the admiralty and

maritime jurisdiction of the Court, under the Jones Act and under the general maritime law of the

United States.   The defendant, Holloway-Houston, Inc., ("Holloway" or "the defendant")

disputes jurisdiction, arguing that because the plaintiff sued it strictly under state common and

statutory law, it is entitled to a jury trial.   Holloway argues this point, more so, now that the

plaintiff's employer Global Industries LTD ("Global") is no longer a party defendant.

The plaintiff entered into a settlement with his employer, Global Industries, Ltd. on November 23, 2010, two business days prior to the commencement of the scheduled trial. Once the defendant learned of the settlement, however, it promptly demanded a jury trial and insisted that it had, from the outset demanded a jury trial.  The records shows, however, that although the defendant stated in the prayer to its original answer "upon the jury trial," no jury was formally requested until November 16, 2010, the day after the case was set to be tried.  Because the Court was engaged in trial in another case, at the time, the cause was delayed to November 29.

In addressing the jury demand of Holloway, the Court was faced with the question of whether the alleged activity was so closely related to activity traditionally subject to admiralty activity that admiralty law should apply.  In short, was the incident "fortuitously and incidentally connected" to admiralty in such a manner that it bears no relationship to "traditional maritime activity."  (Citation omitted.) The Court was and is of the opinion, and announced in open court, that the injuries allegedly sustained fall within the type that occurs in maritime settings.  On the occasion, Global was testing a rigging device constructed by Holloway for use in anticipated offshore lifts.  Therefore, the intended use of the rigging was clearly known to Holloway in that it was for offshore not land-based lifting.  The evidence supports the findings that Holloway tortious activity had a potentially disruptive impact on maritime commerce and, as well, was substantially related to traditional maritime activity.  The Court is still of that opinion and, therefore, a jury trial was not required.

III.     **FACTUAL BACKGROUND**

On March 18, 2009, while using rigging designed and manufactured by Holloway, the plaintiff was injured.  On the occasion, the plaintiff and other members of the crew were aboard the vessel HERCULES, within a protected boat slip, yet on navigable waters.  The lifting was in

preparation for a job that Global contracted to perform in the Gulf of Mexico. The job requirements call for the testing of the HERCULES crane and riggings to lift and hold in place 2000 tons of weight for a 15-minute period.

In order to perform the test lifts a barge, owned by a third party, was obtained and the barge was "ballasted" with water based on the calculations of the engineers. Padeyes were attached at strategic points along the sides of the barge in order that the rigging slings and lines could be safely attached from the crane to it. Holloway designed, manufactured, assembled and delivered the rigging to the test site. The rigging (shackles and slings) are strung through four equalizer blocks and sheaves, designed to equally distribute the load among the blocks, each capable of holding up to 1.562-5 tons per block

Prior to the test lifts, Holloway had tested the rigging only on a horizontal test bed utilizing hydraulic pressure. A certificate, certifying the test load of the rigging equipment, was issued by Holloway. On the occasion of the lift, representatives from Global and its customer, as well as personnel from Holloway were present. The load was successfully lifted on two occasions before the testing crew questioned whether the barge had been sufficiently ballasted. It appears, and it is not a disputed issue here, that the load cell gauge on the crane did not register a lift of 2000 tons on either lift. Therefore, the engineers re-checked their earlier calculations and, assured that their calculations were correct and that the load cell gauge was defective, proceeded with the third lift.

The test barge was lifted from the water and was being held in position when two of the equalizer blocks failed causing one side of the lift barge to drop back into the water. Debris from the equalizer blocks was blown/thrown over a wide area. As the debris was scattering,

undetermined parts struck the plaintiff's left hand and right leg, causing significant personal damages.

## IV.    CONTENTIONS OF THE PARTIES

### A.    The Plaintiff's Claimed Injuries

The plaintiff contends that he sustained serious and significant injury to his hand, leg and body, including loss of one finger, as well as significant damage to the nerves, tendons, and other parts of his left hand, resulting in a significant loss of use of his hand.  In addition, the plaintiff asserts that he sustained a severe fracture of his right femur and leg in general, as well as significant cuts and bruises on his leg and foot.  Finally, the plaintiff claims that he sustained significant injury to his lower back and other parts of his body as a result of the incident.

The plaintiff also asserts that he suffered a subsequent injury that he relates was caused in whole or in part by the disabling physical condition that he suffered on March 18, 2009.  The plaintiff contends that on or about July 4, 2010, while traveling to the United States from Spain, he slipped and fell in the lavatory in the Dallas/Fort Worth Airport.  According to the plaintiff, he stepped into a slippery substance and, unable to recover his balance due to his previous right leg injury, he fell forward and sustained serious injuries to his face and pelvis that required surgery for repair of a fracture to his pelvis.

### B.    The Defendant's Objections to the Plaintiff's Losses

Holloway disputes that the fall in the airport was caused or contributed to by the injuries that he suffered during the test lift in March of 2009.  It also challenges the plaintiff's claim that he suffered and will suffer an annual economic loss of $130,879.  Instead, Holloway argues that the plaintiff's wage statement, reflecting an annual salary of $85,000, is more accurate and reliable.  As well, Holloway challenges the testimony in whole of Dr. Kenneth McCoin based on

the assertion that, because he failed to include in his calculations an income tax deduction, his

testimony fails to satisfy the structures of Rule 702 of the Federal Rules of Evidence.

### C.      The Plaintiff's Liability Contentions

The plaintiff contends that the sudden disassembling of two of Holloway's sheaves was

due to the fact that the rigging was not designed, manufactured and/or assembled in a manner as

to either avoid "side loading" either in the testing or in performing lifts of the sort that would be

encountered and experienced at sea.  The plaintiff asserts, and it is undisputed, that Holloway has

on innumerable occasions sold products to Global.  Hence, the plaintiff argues, Holloway was

fully aware of the circumstances of the lift and the potential sea conditions under which Global

would be performing the lifts.   Therefore, the plaintiff contends, Holloway should have

anticipated the possibility of side loading and should have designed, manufactured and

assembled the rigging in a manner that the sheaves could have sustained a side load.

Alternatively, the plaintiff asserts that the equalizer block should have been designed

with a mechanism, such as a "crown" that would have contained the slings and kept them

centered during lifting processes.  The plaintiff's hypothesizes that the side loading was a result

of the sliding and shifting of the slings when the rigging was lowered on the first and/or second

lifts.   The slings apparently repositioned themselves on the equalizer blocks as slack was

experienced during the lowerings of the barge.  In support of this hypothesis, the plaintiff points

to the fact that the pins on which the sheaves rode was at a minimum four (4) inches too long.

Thus, the plaintiff contends there was excessive side clearance that allowed the equalizer blocks

to go into a "geometric configuration" permitting excessive side loads on the blocks resulting in

the failure of the two blocks.

### D.   The Defendant's Liability Contentions

Holloway does not dispute that the cause of the rigging failure was side loading. However, contrary to the plaintiff's view, Holloway asserts that the side loading event was unanticipated and a result of external forces executed against the slings, causing the sling to slide within the equalizer block and, thereby, disassemble.   (The plaintiff contends that the side loading event was internal and caused by a shift in the slings on the equalizer block.)   In this regard, Holloway points to the fact that Global attached tugger lines to two of the four shackles and pulled on the shackles in such a manner as to cause the side loading and failure in the equalizer block(s).   Hence, the tugger lines caused any sliding or shifting of the slings against the collars of the equalizer block(s).   Holloway admits that it did not test for side loading.   Nor were the equalizer blocks designed to withstand a particular level of side loading.   Finally, Holloway admits that in April, when the lift test was repeated without equalizer blocks, tugger lines were again attached to the slings, although attached against its advice.

## V.   FINDINGS OF FACT – PRODUCT LIAIBLITY/NEGLIGENCE

With these contentions before us, the Court turns to its Findings of Fact.

### A.  Findings of Fact – Product Liability

The plaintiff commenced this suit in June of 2009, asserting that he received serious, disabling and painful personal injuries, specifically the amputation of a finger on his left hand and serious injury to his nerves, tendons, and other damages causing a loss of a substantial loss of use of the hand; a severe injury to his right femur; and low back, pelvis and other parts of  his body as a result of the negligence of the defendant.  The plaintiff's claims against the defendant are asserted under the Jones Act, 46 U.S.C. § 688, the general maritime law, and other applicable laws of maritime product liability and tort.  The plaintiff alleged that the defendant was negligent

and that its product, the slings, shackles, and the equalizer blocks were unreasonably dangerous in design, manufacture, and as delivered to Global.

From 2007 until the date of his injury, the plaintiff was assigned to work aboard the vessel HERCULES in the service of his employer. The Court finds that the HERCULES is a pipe laying derrick vessel, that has been used all over the world. This plaintiff is a "Jones Act" seaman connected to the HERCULES for over two years prior to his injury. The Court finds that on or about March 18, 2009, the plaintiff was working, as he had for a number of years, aboard the vessel HERCULES. On the day in question, the vessel was in a protected boat slip area on navigable waters in Corlyss, Louisiana.

On that day, Global was performing a lifting test in response to a requirement by the American Bureau of Shipping to prove the lifting capabilities of the crane located on the HERCULES. This work was being done preparatory to commencing work in the Gulf of Mexico. The requirement was for the crane to lift and hold in place two thousand (2,000) tons of weight for fifteen (15) minutes, a level presumed to be adequate to demonstrate that the crane could be safely used in offshore operations. The weight obtained for this purpose was a barge owned by a third company, which would be ballasted with water until the weight test indicated that the level of two thousand (2,000) tons had been reached. Well in advance of the "lift date", Global inspected the barge to be lifted, and added padeyes to the barge to which the slings and lines were attached safely from the crane. The placement of the padeyes and their capacity are not in dispute.

Holloway holds itself out as an expert in the design, manufacture, assembly, and delivery of lifting mechanisms, including rigging to be used on projects such as this occasion. After the requirements of the job were clearly known by Holloway, it designed, manufactured, assembled

and delivered rigging, that could be hooked onto the crane portions of the HERCULES and further connected to the padeyes on the lift barge.  Global as well as the plaintiff and other members of the crew relied entirely on the expertise, knowledge, and representations of Holloway, that the gear being delivered would safely fulfill the requirements of the job.  On March 18, 2009, the rigging provided by Holloway was connected and two lifts of the barge were successfully completed.  However, the load cell gauge on the crane did not register a weight that fulfilled the testing requirement.  After the engineers were satisfied that the barge was properly ballasted, a third lift was commenced.  It was on the third that, suddenly, two of the equalizer blocks came apart causing debris to fly over a wide spread area and resulting in substantial damage to both property and to the plaintiff.

The Court finds that the equalizer blocks, the pins, slings, and all other parts of the rigging that failed were designed, manufactured, or assembled by Holloway and were delivered to the jobsite as a "rigging package."   Moreover, the rigging failure occurred at a time when the rigging was being put to its normal and expected use.  As well, Holloway admitted that over 50% of its sales are to companies, such as Global, who engage in offshore operations.  Holloway has, on innumerable occasions in the past, supplied parts and equipments to Global for offshore operations.   Hence, Global, as well as the plaintiff, had reason to rely upon the design, manufacture and reliability of Holloway's rigging.

Holloway alleges that side loading, caused by Global's connection of tugger lines from the tugger wench to shackles on the rigging caused or contributed to the failure of the equalizer blocks.  However, this allegation is unfounded and overlooks the fact that two loads were safely lifted before the failed lift.  Moreover, the crane operator testified that the tugger lines were not pulling at any time during the lifts.  He testified that the tugger lines are in place only to guide

the load and prevent the load from turning. Since there was no problem with the third lift until the failure, and, there was no reason to activate the tugger lines.  The operator of the tugger winch testified that the lines was "snug" but not pulling at the time of the failure; moreover, the tugger wench was in neutral position with the brake off when the failure occurred.  This testimony was confirmed by other witnesses' testimony.  This testimony is undisputed and the Court finds the witnesses credible.

Holloway's engineer who designed the equalizer block, calculated that it would require approximately thirteen (13) tons of pull from the tugger winch to cause a side load of the magnitude that caused the failure of the equalizer block.  He admitted that in the absence of that force that his theory, that the tugger lines caused the failure, would not be credible.  Holloway presented no evidence that a force of any amount was applied to the shackles. Moreover, there is evidence that the tugger winch was incapable of pulling that size load.

The Court finds that there is no evidence that the tugger winch or lines was a cause or a contributing cause of the failed lift. Additionally, the evidence is undisputed that there was no wind, no unusual movement in the load, and no reason for the tugger lines to pull on the rigging because the load was straight. The Court further finds that the equalizer blocks exploded due to side loading because of improper design and manufacture, which was the proximate and legal cause of the failure, and the injuries suffered by the plaintiff.  More specifically, as manufactured and delivered, the pins inside the equalizer blocks allowed an excessive amount of movement of the slings within the blocks.  This "pin slop" resulted in the slings repositioning themselves after the first two lifts when the rigging was lowered.

The plaintiff's expert, whom the Court finds is qualified and credible, testified that a very simple addition to the mechanism would have prevented the occurrence. He is a registered

mechanical engineer and is currently the Sr. Mechanical Engineer for Engineered Casting Repair Service-Metalock, as well as Professor Emeritus in Mechanical Engineering at Louisiana State University, Baton Rouge, Louisiana. He has served as a mechanical engineering consultant since 1972, and has published or authored numerous articles, including but not limited to, stress analysis and failure prevention in design in mechanical engineering. He testified that the reason for the side loading was the unsafe design of the equalizer block. This testimony is confirmed by the evidence and logic which dictate that this finding because there was no testing for side loading; no provision for side loading; and the defendant's admission that side loading was the cause of the failure and that it could have designed the equalizer blocks with a protective device that would have prevented pen slop.

### B.  Findings of Fact—Negligence

The Court is also of the opinion that Holloway was negligent in:

(a)     failing to warn Global that the equalizer blocks were a new design and that it had never been manufactured them before, or tested them in the field;

(b)     failing to construct the equalizer blocks to the standards shown in its drawings, specifically in constructing the equalizer blocks with excessive (pin slop) allowing the slings to move off center;

(c)     failing to properly design the equalizer sheaves and its components;

(d)     failing to properly manufacture the equalizer sheaves and its components;

(e)     failing to have a mechanism, such as a "crown" or washers that would have contained the sling and kept it centered during the lowering and lifting processes;

(f)     representing to the plaintiff and others, by its delivery of the lifting mechanisms in questions, that the equipment was safe to use in the lifting test as proposed;

(g)     failing to warn the plaintiff or Global of the dangerous condition existing in the design of the equalizer blocks;

(h)     failing to compensate for the side loading of the equalizer blocks knowing that pin slop existed in the blocks as manufactured, designed and delivered;

(i)     failing to properly and adequately participate in the supervising of this operation knowing that this was the first time, in a lifting operation of this magnitude, that this particular rigging design had been used;

(j)     the failure of Holloway or its executive, who was on the job site during the first two "lifts," to warn the plaintiff and/or the plaintiff's supervisors of the dangers that might exist in the work area;

(k)     failing to properly and adequately test the equalizer block and its parts under test conditions that would include the possibility of internal side loading caused by pin slop in the equalizer blocks; and

(l)     failing to warn the plaintiff that the equalizer sheave was defective, and as demonstrated by the occurrence in question, had a propensity or tendency to cause physical harm to the plaintiff.

## VI.     THE PLAINTIFF'S INJURIES AND TREATMENT

The plaintiff's treating orthopedist, Dr. Zoran Cupic has been treating the plaintiff since he was transferred to his care from Louisiana. Dr. Cupic is a board certified orthopedic surgeon who is well qualified to render his medical opinions regarding the injuries and treatment of the plaintiff since June 12, 2009.  He reviewed the substantial treatment given to the plaintiff in various medical facilities in Louisiana. The Court finds that based on his testimony, and the substantial medical records in this case and the plaintiff's own testimony,

the plaintiff when taken from the HERCULES had sustained substantial injuries to left hand, right leg femur, and foot. The Court has examined photographic evidence, taken by a fellow crewman of the plaintiff.

Surgery was performed on the plaintiff's hand on March 18, 2009, March 19, 2009, and March 20, 2009.  Treatment has continued since the date of the injury with the result of an amputation of one finger and a significant impairment to the use of the remaining fingers on that hand. The loss of use of the left hand, and the physical impairment, according to Dr. Cupic, is substantial. These impairments to his left hand have also made it difficult for the plaintiff to perform daily personal functions, as well as any work functions.

Significant injury was also sustained to the plaintiff's right femur and leg. The evidence shows that when admitted to the hospital, the plaintiff received a reduction of the right femur injury and was placed in traction.  Later, he was then transferred to Our Lady of the Lake Medical Center where surgery was performed on March 23, 2009, resulting in an internal open reduction and internal fixation of markedly displaced fractures of the femur by the placement of various plates and fixation screws within the femur.   The plaintiff underwent three months of hospitalization and rehabilitation treatment before being released to Dr. Cupic's care on June 12, 2009.  Between intervals of treatment with Dr. Cupic, the plaintiff has received constant care in the form of physical therapy in Spain for his hand and his femur.

The evidence also shows that the plaintiff sustained a compression fracture to his low back and a herniated disc as a result of the failed lift of March 18, 2009. Dr. Cupic testified that he believed initially that the complaints of back pain may have been the result of the fact that there was now a disparity in the length of the plaintiff's legs.  However, when the plaintiff's complaints continued, an MRI test was performed that revealed significant injury to his back.

Dr. Cupic opined that the plaintiff is physically unable to return to work that involves climbing, lifting, pulling, or the use of his left hand, right leg, low back, and that these were permanent injuries. Dr. Cupic also confirmed the plaintiff's testimony that the plaintiff, undoubtedly, has suffered great physical pain and physical impairment, that are permanent and unremitting. He testified that the plaintiff has been unable to work and was in constant pain, even before his fall in the Dallas/FortWorth Airport. The failed lift event was sufficient cause for the plaintiff to incur medical bills and surgery, for which he suffered physical impairments that limited his movement, and his ability to engage in the day-to-day activities of life such as walking, climbing steps and climbing ladders. As a result, he suffered pain and mental anguish, which will continue for the duration of his lifetime.

However, the plaintiff suffered facial injuries and a fractured pelvis in a subsequent fall that took place on or about July 4, 2010, which the Court finds was contributed to, or caused in whole or in part, by the plaintiff's inability to control the movement of his right leg as he lost his balance. The evidence shows that without the physical limitation to the plaintiff's right leg, he, in all likelihood, would not have sustained the injuries that he experienced on that occasion. Therefore, the Court finds that the injuries suffered by the plaintiff on March 18, 2009, contributed to cause, in whole or in part, the July 4, injuries.

The Court also heard testimony from Dr. Arthur Tarbox, a professional psychologist, who is a diplomat of the American Board of Professional Psychology, and a respected Fellow of the Academy of Clinical Psychology. He testified that he has seen the plaintiff on several occasions for the purpose of treating the plaintiff's complaints of sleeplessness, depression, and mental anguish. He testified that the plaintiff is extremely anxious about the future and feels helpless. He stated that the plaintiff is dealing with Post Traumatic Stress Disorder, chronic pain

syndrome, permanent disability, physical impairment, and a sense of disfigurement. Dr. Tarbox testified that he interviewed the plaintiff's wife outside the presence of the plaintiff, and that she confirmed that her husband is a changed man since his injury.  Moreover, she is worried that he has given up on the fact that his life will ever again have any meaning.

Having heard the testimony of these witnesses, and the testimony of the plaintiff, the Court concludes that the plaintiff has endured mental anguish in the past, which will in all probability continue in the future, and that it will, in all medical probability, be permanent.

## VII.   DAMAGES—MEDICAL/ECONOMIC

### A.   Medical Expense Findings

Dr. Cupic testified that the plaintiff had incurred medical expenses in the past in the amount of $309,461.36 and that said charges were for reasonable treatment, and that the charges reflected were the usual and customary charges for such treatment in Texas and Louisiana.  In addition, Dr. Tarbox testified that his charges for treatment were $1,275.00. The total of these past medical expenses is $310,736.36.  The plaintiff also has continued to receive medical therapy and psychological treatment in Spain.  Dr. Cupic also testified that the plaintiff would in reasonable medical probability need the following treatment in the future: (i) back surgery - $50,000; (ii) Hand and Femur Treatment for 22.4 years life expectancy - $112,000; (iii) hip surgery - $45,000 to $50,000.

### B.   Economic Damages

Dr. Kenneth McCoin, Ph.D., the plaintiff's economist, testified that the plaintiff has a work life expectancy of 8.3 years, and a life expectancy of 22.4 years.  He is a chartered financial analyst, and has been President of Waterford International Asset Management, Inc., specializing

in economic and financial analysis. Since 1978, he has served as an adjunct professor in business and economics at Houston Baptist University.  As well, he is a published author.

Dr. McCoin considered the following undisputed facts in rendering his economic opinions:  the plaintiff has worked in the offshore industry of the United States of America for more than thirty-seven (37) years.  He testified that the plaintiff has losses in the past and will sustain losses in the future in excess of one million eighty-one thousand one hundred thirty nine dollars ($1,081,139) in wages, including past economic loss of $189,635, inclusive of lost wages and fringe benefits and future losses in the amount of $891,504. He based his testimony on the plaintiff's actual pay records from Global.  The wage records showed that Global did not deduct income taxes from the plaintiff's wage because as a Spanish national working outside his country for more than one hundred eighty-three (183) days per year, the plaintiff incurred no income tax liability.  This testimony was substantiated by the plaintiff's pay records, an interview with the plaintiff, and his more than (30) years of experience in his field, including cases where he has evaluated the wage loss of foreign national ex-patriot maritime workers.

Based on the totality of the evidence in this case, the Court finds and concludes that the plaintiff has sustained the following losses by a preponderance of the evidence:

(1)     the plaintiff has suffered great physical pain and mental anguish in the past in the amount of $18,000;

(2)     the plaintiff will continue to suffer physical pain and mental anguish for the remainder of his life (for twenty-two point four (22.4) years life expectancy) in the amount of $200,000;

(3)     the plaintiff has suffered physical impairment in the past in the amount of $20,000;

(4)     the plaintiff will suffer physical impairment for the remainder of his life (for twenty-two point four (22.4) years life expectancy) in the amount of $60,000;

(5)     the plaintiff has suffered physical disfigurement in the past  in the amount of $5,000;

(6)     the plaintiff will suffer physical disfigurement for the remainder of his life (for twenty-two point four (22.4) years life expectancy) in the amount of $15,000;

(7)     it is found that the plaintiff incurred medical expense in the past in the amount of $310,736.36;

(8)     in reasonable medical probability the plaintiff will incur future medical expenses (considering life expectancy of twenty-two point four (22.4) years) in the amount of $207,000;

(9)     plaintiff has suffered loss wages and benefits from the date of the accident until the date of trial in the amount of $239,901.00;

(10)    plaintiff will, in all reasonable probability, will suffer loss wages and benefits in the future amount of $846,687.00.  Consequently, the Court finds that plaintiff has sustained damages in the total amount of $1,922,324.36.

The Court Orders that pre-judgment interest be paid at the rate of three percent (3%) on $593,637.36 from March 18, 2009, until the date of this judgment and at the legal rate thereafter. The plaintiff is also awarded taxable costs of court, pursuant to the applicable cost statute, the local rules of this Court, the Federal Rules of Civil Procedure, and applicable Fifth Circuit Case law.

## VIII.   CONCLUSIONS OF LAW

Based on the Findings of Fact, the Court concludes that the time of his injury on March 18, 2008, the plaintiff was a "seaman" as that term is defined and was employed by the Global Industries, LTD.  This Court has jurisdiction over all claims made herein pursuant to the Jones Act and the General Maritime Law, therefore a jury trial is unwarranted.

The injuries sustained by the plaintiff on March 18, 2008, as described in the Court's Findings of Fact, were proximately caused by the negligence of Holloway.  Such negligence was the legal and factual cause of the plaintiff's injuries.  Moreover, the March 18, 2008 injuries contributed to or caused in while or in part the fall and attendant injuries suffered on July 4, 2010.

Finally, the Court concludes that neither Global nor the plaintiff were negligent to any degree in causing the occurrence in question.  To the extent any Findings of Fact constitutes a Conclusion of Law, the Court hereby adopts it as such.  To the extent any Conclusion of Law constitutes a Findings of Fact, the Court hereby adopts it as such.  In light of the Court's Findings of Fact and Conclusions of Law, it is unnecessary for the plaintiff to provide the terms of his settlement agreement with his employer, Global.

It is so ORDERED.

SIGNED at Houston, Texas this 6th day of January, 2011.

_____
Kenneth M. Hoyt
United States District Judge

17